**YETI BY MOLLY LTD, a Montana corporation; Molly Strong–Butts, Plaintiffs–Appellees–Cross–Appellants,**

v.

**DECKERS OUTDOOR CORPORATION; James E. Granville, Defendants–Appellants–Cross–Appellees.**

Nos. 99–36112, 99–36132.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 14, 2001

Filed Aug. 8, 2001

Alan J. Lerner, Kalispell, Montana for the plaintiffs-appellees-cross-appellants.

Ward E. Taleff, Alexander, Baucus, Taleff & Paul, Great Falls, Montana for the plaintiffs-appellees-cross-appellants.

Daniel U. Smith, Kentfield, California for the defendants-appellants-cross-appellees.

A. Barry Cappello, Cappello & McCann, Santa Barbara, California for the defendants-appellants-cross-appellees.

William O. Bronson, Great Falls, Montana for the defendants-appellants-cross-appellees.

William E. Ireland, Haight, Brown & Bonesteel LLP, Los Angeles, California for the defendants-appellants-cross-appellees.

Before: B. FLETCHER, MELVIN BRUNETTI, and RAYMOND C. FISHER, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

In this diversity action, plaintiffs claim that defendants misappropriated their trade secrets in the design elements of a boot. Following a ten-day trial, a jury returned several verdicts against one of the defendants, Deckers Outdoor Corporation ("Deckers"), and awarded almost $2 million in compensatory damages. Deckers appeals, asserting that many of the jury's verdicts were unsupported by the evidence and that the verdict form was flawed. Plaintiffs cross-appeal, faulting the district court's refusal to award exemplary damages or attorney's fees.

## I.

In January 1989, Molly Strong ("Strong") invented what she believed to be a better shoe. It was a winter boot, dubbed "Yeti," incorporating innovations to maximize traction, warmth, and dryness. Strong filed a patent application for Yeti, and a patent issued in her name in September 1992.

In early 1993, Strong incorporated an entity called "Yeti by Molly, Ltd." At about the same time, she sought a partner to help her mass produce her products. She met a man, a self-described "old shoe dog," named James E. Granville ("Granville") who expressed interest in her designs. Strong had Granville sign a nondisclosure agreement before she would discuss anything of substance with him. After he signed the agreement, she provided him with secrets embodied in a yet unrevealed second patent application, samples of her product, and confidential details about the company's attempts to expand production and sales. In response, Granville sent Strong a letter full of praise and hopeful predictions.

In September 1993, unknown to Strong, Granville told Peter Link ("Link"), Vice-President of Deckers Outdoor Corporation ("Deckers")—the maker of the popular Teva line of sandals—about Strong and the Yeti. Link hired Granville as a shoe consultant to Deckers; this was the beginning of a fruitful relationship, and Granville eventually became a Director of Project Development for Deckers.

Link called Strong in September 1993 and told her that Deckers was looking for winter footwear products. Strong had Link sign a nondisclosure agreement in his capacity as Deckers' Vice–President before beginning any discussions. Two months of steady negotiations ensued, during which time Link pleaded with Strong not to sign any deals with other companies until Deckers could evaluate her products and make her an offer. After learning many of Strong's secrets, he made overtures to her about acquiring the company. Many letters were exchanged in an attempt to finalize terms, and on November 8th, Strong and Yeti by Molly accepted what they believed was an oral agreement to do business with Deckers. Strong believed that after a few formalities had been completed, the formal signing would occur. On the strength of that belief, Strong abandoned

negotiations with another entity called S & K Electronics ("S & K") to produce the Yeti. Then, the day after Strong presented the Yeti to Deckers' sales representatives, Link and the President of Deckers reneged, telling Strong that they would have to renegotiate. The two sides were never able to come to terms.

In Fall 1994, Strong and Yeti by Molly began to suspect that Deckers had incorporated their trade secrets into its products; they eventually sued Granville and Deckers in federal court alleging breach of contract, contractual and tortious breach of the implied covenant of good faith and fair dealing, fraud, deceit, trade secret misappropriation, and civil conspiracy. After a ten-day trial, a jury found in favor of both plaintiffs against Deckers on the breach of nondisclosure contract, breach of implied covenant of good faith and fair dealing, deceit, misappropriation of trade secrets, and civil conspiracy claims. The jury found in favor of Deckers on the fraud and breach of oral contract claims and in favor of Granville on all claims. It found that Deckers was liable to Yeti by Molly for $1,360,000 and to Strong for $425,000, apportioning these damage awards among the five successful causes of action. The jury found that Deckers had not acted with actual fraud or actual malice, and consistent with this finding, the district court denied punitive damages. The district court also denied plaintiffs' subsequent motion for exemplary damages and attorneys' fees and Deckers' motions for judgment as a matter of law and new trial.

## II.

Federal subject matter jurisdiction arises from the diversity of the parties. 28 U.S.C. § 1332. Plaintiff Strong is a citizen and resident of Montana, and plaintiff Yeti by Molly is a corporation incorporated under the laws of Montana with a principal place of business in Montana. Defendant Granville is a citizen and resident of California and defendant Deckers is a Delaware corporation with a principal place of business in California.

The district court entered its judgment on May 12, 1999 and denied post-trial motions on October 20, 1999. Deckers' notice of appeal was timely filed on November 4, 1999, and plaintiffs' notice of cross-appeal was timely filed on November 15, 1999. This court has jurisdiction under 28 U.S.C. § 1291.

## III.

### A. Evidentiary Rulings

#### 1. Exclusion of Vuckovich

Deckers appeals the district court's decision to exclude the testimony of Deckers' only damages expert, Dan Vuckovich ("Vuckovich"). Although Deckers disclosed Vuckovich's identity to plaintiffs on August 1, 1997, it failed to provide his expert report for two and a half years. It justified this shortcoming by noting that he would be used only as a rebuttal witness, and that an expert report would be disclosed if Deckers decided to have him testify. In contrast, plaintiffs timely produced and then supplemented the expert report of their damages expert, an economist named Paul Polzin ("Polzin"). Finally, on February 1, 1999, almost two years after the close of discovery, more than one year after Polzin's report was last supplemented, and just 28 days prior to trial, defendants disclosed Vuckovich's report, which was a rebuttal to Polzin's report. Plaintiffs filed a motion in limine pursuant to Rule 37 of the Federal Rules of Civil Procedure asking the district court to exclude Vuckovich from testifying as a sanction for defendants' failure to comply with the discovery deadlines; the district court granted the motion.

We review the imposition of discovery sanctions for an abuse of discretion.

*Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir.1997). Federal Rule of Civil Procedure 26(a)(2)(B) requires the parties to disclose the identity of each expert witness "accompanied by a written report prepared and signed by the witness." Absent other direction from the court, a rebuttal report shall be filed "within 30 days after the disclosure" of the evidence that the expert is assigned to rebut. Fed.R.Civ.P. 26(a)(2)(C). Rule 37(c)(1) gives teeth to these requirements by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed.[1]

■ By excluding Vuckovich, the district court made it much more difficult, perhaps almost impossible, for Deckers to rebut Polzin's damages calculations. Nevertheless, this case is distinguishable from cases in which we have required a district court to identify "willfulness, fault, or bad faith" before dismissing a cause of action outright as a discovery sanction. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 946 (9th Cir.1993); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir.1983). These cases do not apply because this sanction, although onerous, was less than a dismissal.

■ Furthermore, although we review every discovery sanction for an abuse of discretion, we give particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1). *Ortiz–Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico*, 248 F.3d 29, 34 (1st Cir.2001). This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st

Cir.1998) ("[T]he new rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule. . . ."). The Advisory Committee Notes describe it as a "self-executing," "automatic" sanction to "provide[ ] a strong inducement for disclosure of material. . . ." Fed.R.Civ.P. 37 advisory committee's note (1993). Courts have upheld the use of the sanction even when a litigant's entire cause of action or defense has been precluded. *Ortiz–Lopez*, 248 F.3d at 35 (although the exclusion of an expert would prevent plaintiff from making out a case and was "a harsh sanction to be sure," it was "nevertheless within the wide latitude of" Rule 37(c)(1)). Thus, even though Deckers never violated an explicit court order to produce the Vuckovich report and even absent a showing in the record of bad faith or willfulness, exclusion is an appropriate remedy for failing to fulfill the required disclosure requirements of Rule 26(a).

Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless. Fed.R.Civ.P. 37(c)(1). The district court did not abuse its discretion in deciding that neither of these exceptions applies here. The only justification proffered by the defendants is that they were under the mistaken belief that Polzin's report would be supplemented again and were waiting for the final version before disclosing Vuckovich's report. Even if true, defendants could have issued a preliminary report to be supplemented after Polzin's report had been modified or they could have asked for an extension of the discovery deadline.

1. Rule 37(c)(1) provides, in relevant part:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.
Fed.R.Civ.P. 37(c)(1).

*See Quevedo v. Trans–Pac. Shipping, Inc.,* 143 F.3d 1255, 1258 (9th Cir.1998) (refusing to consider expert's report because it was filed one-and-a-half months late and plaintiff could have asked for an extension of time).

■ Nor has Deckers shown that the delay was harmless. Deckers asserts that the burden of proving harm is on the party seeking sanctions; we disagree. Implicit in Rule 37(c)(1) is that the burden is on the party facing sanctions to prove harmlessness. At least one other circuit court has so held. *Wilson v. Bradlees of New England, Inc.,* 250 F.3d 10, 21 (1st Cir.2001) ("[I]t is the obligation of the party facing sanctions for belated disclosure to show that its failure to comply with [Rule 26] was either justified or harmless....").

Plaintiffs received Vuckovich's report one month before they were to litigate a complex case. To respond to it, plaintiffs would have had to depose Vuckovich and prepare to question him at trial. *See NutraSweet Co. v. X–L Eng'g Co.,* 227 F.3d 776, 786 (7th Cir.2000) ("Without even a preliminary or draft supplemental expert witness report from [the expert], NutraSweet was greatly hampered in its ability to examine him about his analysis of the site work. In these circumstances, the use of the 'automatic' sanction of exclusion was not an abuse of discretion." (citations omitted)). We affirm the decision to exclude Vuckovich's testimony.

### 2. Evidence of Deckers' Gross Sales

■ The district court did not abuse its discretion to allow testimony regarding Deckers' annual overall gross sales and gross sales of Teva products. The district court reasoned that

> [A] review of the record satisfies the court that the evidence was relevant to the issue of damages and not unduly prejudicial or likely to inflame the jury. Evidence was adduced that, if accepted

with all permissible inferences drawn therefrom, could establish a link between defendant Deckers' gross sales and the damages plaintiffs claimed to have suffered. Defendants have presented nothing beyond speculation that the jury's passions were inflamed by the introduction of this evidence, and the court will not presume that this occurred in the absence of a more compelling showing.

These observations are supported by the record and the conclusion is not an abuse of discretion. We affirm.

### B. Damages

#### 1. Sufficiency of the Evidence

Deckers asserts that there is insufficient evidence to support the jury's damages findings. We disagree.

■ We must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork. *Los Angeles Mem'l Coliseum Comm'n v. NFL,* 791 F.2d 1356, 1360 (9th Cir.1986).

The jury awarded the two plaintiffs a combined $1,785,000. We need not decide whether a reasonable royalty was supported by the evidence in this case, because the record evidence of non-royalty damages alone—in the form of plaintiffs' lost profits and lost business opportunities—supports the jury's verdict.

■ First, plaintiffs' expert, Polzin, testified that plaintiffs suffered $8,062,099 in lost opportunities. Polzin came to this figure by calculating the royalties plaintiffs could have made by licensing their trade secrets to other footwear manufacturers. As a factual premise to justify this calculation, another of plaintiffs' witnesses, Ian Whatley ("Whatley"), testified that he had been employed by FILA to find new shoe

technologies and, in that capacity, rejected plaintiffs' designs because Deckers was already using the same technologies in its products.

Plaintiffs also introduced evidence of profits lost when the deal with S & K was lost. Taking the evidence in the light most favorable to plaintiffs, the record reflects that Strong undertook extensive negotiations with S & K and that a draft agreement had been proposed between the parties that would have guaranteed sales of a minimum of 40,000 boots in the first year. This was more than a merely conjectural deal.

Deckers contests this evidence by attempting to contradict or discredit plaintiffs' witnesses, especially Polzin. Deckers made the same arguments to the jury and failed to carry the day. Because there is substantial evidence in the record, we affirm the jury's compensatory damages awards.

### 2. Strong's Trade Secrets

Strong assigned her rights in her patents, including the right to any trade secrets described therein, to Yeti by Molly. Deckers contends that Strong therefore owned no trade secrets and could not have suffered any damages from Deckers' misappropriation.

 There is sufficient evidence in the record to support the jury's finding that Deckers misappropriated trade secrets owned by Strong. Strong testified that she revealed to Link the identity of many of her suppliers. For example, she told Link that she used Malden Mills for Polar–Tec fleece material and revealed the precise type of Polar–Tec that she preferred. She never transferred this secretly maintained list of suppliers to Yeti by Molly. The identity of a supplier can be a trade secret. See Mont.Code Ann. § 30–14–402(4); see also Ackerman v. Kimball Int'l Inc., 634 N.E.2d 778, 783 (Ct.App.Ind.

1994) (holding that supplier lists can be trade secrets under Indiana's Uniform Trade Secrets Act which uses the same definition of a trade secret as Montana) rev'd on other grounds 652 N.E.2d 507 (Ind.1995); 1 Roger M. Milgram, Milgram on Trade Secrets § 1.09[8][c] (2001) (collecting cases). Plaintiffs further introduced evidence that Link misappropriated this information, for example, a memo in which Link told Deckers' employees to use Malden Mills as its supplier and to use the type of Polar–Tec that Strong had specified. The record sufficiently supports the jury's verdict of $175,000 in damages to compensate Strong for Deckers' unjust enrichment and her lost profits arising from the misappropriation of these secrets.

### 3. Deceit

Plaintiffs introduced sufficient evidence into the record to support the jury's combined damages award of $80,000 as a remedy for Deckers' deceit. For example, Strong testified that she abandoned negotiations with S & K as a result of her reliance on Deckers' promises that a binding contract had been established or was imminent. We affirm.

### C. Waiver

 Deckers has waived the right to appeal several issues by not raising them or raising them too late to the district court. "Generally, an appellate court will not hear an issue raised for the first time on appeal." Arizona v. Components Inc., 66 F.3d 213, 217 (9th Cir.1995) (internal quotation marks omitted). We may decline to reach an issue if it was not "raised sufficiently for the trial court to rule on it." Id. A stipulation or "[t]he withdrawal of an objection is tantamount to a waiver of an issue for appeal." CDN Inc. v. Kapes, 197 F.3d 1256, 1258 (9th

Cir.1999) (internal quotation marks omitted).

### 1. Trade Secrets Misappropriation

 "[T]he sufficiency of the evidence is not reviewable on appeal unless a motion [for JMOL under Rule 50(a)] was made in trial court." *Benigni v. City of Hemet*, 879 F.2d 473, 476 (9th Cir.1988) (quoting *United States v. 33.5 Acres of Land*, 789 F.2d 1396, 1400 (9th Cir.1986)). As a limited exception to this rule, we will reverse if there is "plain error apparent on the face of the record" that, if unnoticed, would result in a "manifest miscarriage of justice." *Patel v. Penman*, 103 F.3d 868, 878 (9th Cir.1996). "This exception, however, permits only extraordinarily deferential review that is limited to whether there was *any* evidence to support the jury's verdict, irrespective of its sufficiency." *Id.* (internal quotation marks omitted) (quoting *Benigni*, 879 F.2d at 476).

 Deckers waived the right to contend that plaintiffs' design secrets had lost their status as trade secrets. While presenting Deckers' Rule 50 motion, counsel made this concession:

> That leaves the—in my mind if I have missed anything of importance—trade secrets issue, your Honor. And I don't have a Rule 50 motion on the trade secrets. I think to a large extent the plaintiffs have met the minimum burden of putting on a trade secrets case before the jury, and I would be wasting the court's time and my time to argue it, although I strongly and firmly believe that they have no trade secrets case because they have no damages.

With this unequivocal concession, Deckers abandoned the right to challenge the sufficiency of the evidence supporting the jury's trade secrets misappropriation verdict on appeal except under a claim of plain error.

 There is no plain error, given the extraordinarily deferential standard of review, because plaintiffs introduced evidence to support the jury's verdict. *See Benigni*, 879 F.2d at 476.[2] Whatley, plaintiffs' footwear expert, testified that Deckers misappropriated several trade secrets and incorporated them into its product lines. These trade secrets were not public or known to the footwear industry before Strong revealed them to Deckers. No plain error having been shown, we decline to address Deckers' argument that plaintiffs' secrets were not trade secrets.

### 2. Challenges to the Form of the Verdict

 Because the parties could not agree on how to word a special verdict form, the district court created a form on its own, essentially a general verdict form. Deckers contends now that there were several errors inherent in the verdict form. These are not claims about the way the jury answered the form's interrogatories, rather these are allegations that errors were built into the form itself. We hold that Deckers waived these contentions by failing to raise them until after the jury had rendered its verdict and was discharged. *Cf. Home Indem. Co. v. Lane Powell Moss and Miller*, 43 F.3d 1322, 1331 (9th Cir.1995) (holding that a party waived its objection to the jury's verdict by not objecting to an alleged inconsistency prior to the dismissal of the jury).

---

**2.** Furthermore, Deckers argument that the court failed to instruct the jury about the element of damages has no merit. The Montana statute does not require a finding of damage as an element of trade secrets misappropriation. Mont.Code Ann. § 30–14–402. Even if it did, any error would be harmless, because the district court's instructions required the jury to calculate damages "caused by misappropriation."

The district court gave the parties ample opportunity to object to errors in the form of the verdict. The court expressly asked the parties if they objected to the verdict form when it first distributed it. Defendants objected only that a special verdict form should have been used instead. Later that day, after the court had instructed the jury, it asked again whether the parties had any objections; again, Deckers lodged only its general complaint against the form. During the three days that the jury deliberated, Deckers could have objected to problems with the form, but did not. Finally, Deckers could have objected after the verdict had been announced but before the jury was released.[3] By waiting until post-trial motions to raise its specific contentions, Deckers prevented the court from correcting any problems *ex ante* and, for some of these contentions, prevented the development of an adequate record.

### a. Duplicative Awards

██ The verdict form required the jury to assign a separate damages figure for each cause of action. Deckers waived the argument that the jury double-counted by returning five damages figures (one for each cause of action) for each plaintiff. By failing to raise this argument until after the jury was discharged, the district court had no chance to develop a record of how the jury apportioned damages. Without this record, we decline to speculate and allow the verdicts to stand.

### b. Conspiracy Damages

██ Deckers waived its objection to the verdict form's allowance for damages for civil conspiracy. Although this issue involves a pure question of law—is civil conspiracy a source of a separate actionable wrong that can sustain a damages verdict under Montana law?—we decline

to exercise our discretion to consider it. Unlike some of the other arguments discussed in this section, Deckers did not even squarely raise this argument in its post-trial motions. The district court was never given a chance to pass on this issue, and there is no danger that a "manifest injustice" will result from our refusal to consider it. *See Los Angeles News Serv. v. Reuters Television Int'l, Ltd.,* 149 F.3d 987, 996 (9th Cir.1998). For these reasons, we decline also to reach Deckers' related argument that it could not be liable for conspiracy unless Granville was also found liable.

### c. Breach of Implied Covenant of Good Faith and Fair Dealing

██ Deckers also charges error in the conflation on the general verdict form of contractual and tortious breach of the implied covenant of good faith and fair dealing. This charge of error should have been manifest on the face of the form, and Deckers waived it by not raising it before the court released the jury.

### 3. Tortious Breach and Special Relationship

██ Deckers waived the argument that plaintiffs failed to introduce evidence of a "special relationship" to satisfy an element of tortious breach. This argument was not raised in Deckers' Rule 50 motion at the completion of plaintiffs' case-in chief, even though the alleged failure of proof, if such it was, would have been evident at that time. By waiting until post-trial motions to raise this argument, Deckers waived the right to appeal. *See Beech Aircraft Corp. v. United States,* 51 F.3d 834, 841 (9th Cir.1995) ("Because Plaintiffs could have raised this issue at or before trial and because they have not presented any valid

---

**3.** Although the district court did not expressly ask the parties whether they had any objec-

tions before releasing the jury, it did ask the parties whether the jury should be polled.

reason for not having done so, we decline to consider Plaintiffs' . . . argument.").

### D. Plaintiffs' Cross–Appeal: Exemplary Damages and Attorneys' Fees

Plaintiffs' cross-appeal raises a question of statutory interpretation: can a court award exemplary damages under Montana's trade secrets statute if a jury has decided that punitive damages are not available? When the jury was asked, on the verdict form, whether it found, "by clear and convincing evidence," that Deckers acted "with actual fraud and/or actual malice," it responded "No." Consistent with this response, the district court refused to award plaintiffs punitive damages under the state's *general* punitive damages statute, Mont.Code Ann. § 27–1–221. Plaintiffs then moved for exemplary damages under Montana's trade secrets statute, which provides that "[i]f willful and malicious misappropriation exists, the court may award exemplary damages." Mont.Code Ann. § 30–14–404(2).[4]

The district court refused to decide whether "willful and malicious misappropriation" existed because it felt bound by the jury's verdict on punitive damages. It said, "[a]s the jury properly was instructed on the requirements of MCA § 27–1–221 and declined to award punitive damages, it cannot be said that 'willful and malicious misappropriation exist[ed].'" We must determine whether the exemplary damages provision of the Montana Uniform Trade Secrets Act ("MUTSA") is meant to do no more than incorporate Montana's general punitive damages test.

 We ordinarily review the district court's refusal to award exemplary damages for an abuse of discretion. *Brown-*

ing–Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). However, when the decision to award such damages turns on application of state law, review is de novo. *Cent. Office Tel., Inc. v. Am. Tel. & Tel. Co.*, 108 F.3d 981, 993 (9th Cir.1997) *rev'd on other grounds*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

 We conclude that the Montana legislature did not incorporate the definition of punitive damages into the trade secrets act. First, under § 27–1–221(5), general punitive damages must be proved "by clear and convincing evidence." Nothing in the MUTSA suggests that exemplary damages and attorneys' fees need to be proved by clear and convincing evidence. By deferring to the jury, the district court implicitly imported not only the substantive definition of "actual malice," but also the heightened quantum of proof requirement. This was legal error.

Second, the Montana legislature has shown that it knows how to reference the punitive damages section specifically. Other Montana statutes allow for punitive damages by specifically referring to section 27–1–221, *e.g.*, Montana Unfair Trade Practices Act § 33–18–242(4), or by borrowing language directly from 27–1–221, *e.g.*, Montana Wrongful Discharge Act, § 39–2–905(2). In contrast, in the MUTSA, the legislature used the words, "willful and malicious," words that are defined differently and separately from § 27–1–221 in the "General Definitions" part of Montana's statute. §§ 1–1–204(3), 1–1–204(5). Furthermore, the official commentary to the MUTSA establishes that the exemplary damages provision "follows federal pat-

---

4. The plaintiffs also moved for attorney's fees pursuant to section 30–14–405 which provides that "If . . . willful and malicious misappropriation exists, the court may award reasonable costs and attorney fees to the pre-

vailing party." Because the exemplary damages analysis and the fees analysis turn on the construction of the same language, we focus on the former.

ent law in leaving discretionary trebling to the judge even though there may be a jury...." Mont.Code Ann. § 30–14–404 commissioner's notes.

Lastly, the Montana statute is a codification of the Uniform Trade Secrets Act, and the sentence in question is taken almost verbatim from the uniform code. Uniform Trade Secrets Act § 3 ("UTSA"). A Minnesota Court of Appeals ruled that its state legislature, by adopting the UTSA, had meant the exemplary damages provision to prevail over the general punitive damages statutory provisions. *Zawels v. Edutronics, Inc.*, 520 N.W.2d 520, 523–24 (Minn.Ct.App.1994).[5] The Minnesota court focused on the provision of its state's trade secret statute that explicitly provides that it "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Minn. Stats. Ann. § 325C.07. Montana's statute contains an identical provision. Mont.Code Ann. § 30–14–408(1).

We reverse the district court's refusal to consider plaintiff's motion for exemplary damages and attorney's fees and remand to allow the district court to make an independent judgment about whether Deckers' misappropriation was "willful and malicious." We express no opinion as to whether the record establishes that Deckers' conduct satisfies these criteria.

## IV.

We affirm on all grounds raised by Deckers' appeal. With respect to plaintiffs' cross-appeal, we reverse the district court's refusal to consider an award of exemplary damages or attorney's fees and remand to the district court for further proceedings consistent with this opinion.

5. An express goal of the UTSA is to create uniformity "among states enacting it." Mont.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.